IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-1279

 Filed: 7 August 2018

Mecklenburg County, No. 16 CRS 211825

STATE OF NORTH CAROLINA,

 v.

SYDNEY SHAKUR MERCER, Defendant.

 Appeal by defendant from judgment entered 8 May 2017 by Judge Jesse B.

Caldwell, III in Mecklenburg County Superior Court. Heard in the Court of Appeals

16 May 2018.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Grady
 L. Balentine, Jr., for the State.

 Cheshire Parker Schneider & Bryan, PLLC, by John Keating Wiles, for
 defendant-appellant.

 ZACHARY, Judge.

 Defendant Sydney Shakur Mercer was indicted for possession of a firearm by

a felon and for two counts of assault with a deadly weapon with the intent to kill. A

jury found defendant not guilty on both charges of assault, but guilty of possession of

a firearm by a felon. Defendant appeals from judgment entered upon his conviction.

On appeal, defendant argues that the trial court erred in denying his request for a

jury instruction on justification as a defense to the charge of possession of a firearm
 STATE V. MERCER

 Opinion of the Court

by a felon. After careful review, we conclude that defendant was entitled to an

instruction on justification as a defense.

 Background

 In April 2016, defendant was indicted for possession of a firearm by a felon and

two counts of assault with a deadly weapon with the intent to kill. The charges

against defendant were joined for trial and came on to be tried before a jury at the 20

March 2017 criminal session of Mecklenburg County Superior Court, the Honorable

Jesse B. Caldwell, III presiding.

 The charges against defendant arose from an altercation that took place on 30

March 2016 on Peach Park Lane in Charlotte, during which defendant, a convicted

felon, possessed a gun. During the events that gave rise to the charges against

defendant, defendant resided on Peach Park Lane, near the home of Dazoveen Mingo.

On 29 March 2016, Dazoveen was playing basketball in the neighborhood.

Defendant’s cousin Wardell was also present, and, at some point, Wardell’s phone

was stolen. He believed that Dazoveen was the culprit and the two nearly fought.

The following day, Dazoveen was “walking . . . to the candy man” when he

encountered Wardell and an individual he identified as “J.” Wardell repeated his

previous accusation that Dazoveen had stolen his phone, and a fight occurred.

Defendant’s mother broke up the fight.

 Dazoveen left and notified his brother, Nacharles Bailey, who informed their

mother, Dorether Mingo (“Ms. Mingo”). While Dazoveen and Nacharles waited for her

 -2-
 STATE V. MERCER

 Opinion of the Court

to arrive home, Ms. Mingo called her sister, Lina. Ms. Mingo and her other son,

Jaquarius, arrived at their home within approximately five to ten minutes. The

Mingos and additional family members then walked over to defendant’s home, where

Wardell was visiting, with the intention of fighting. At that point, an altercation

occurred. The participants and witnesses provided different versions of the event at

trial.

I. The State’s Evidence

 At trial, the State presented evidence tending to show the following: Dazoveen

testified that approximately fifteen people walked to defendant’s home in order to

fight. The only armed person in the Mingo group was Dazoveen’s aunt, Lina, who

arrived later. Upon their arrival at defendant’s home, a black Cadillac pulled into the

driveway and defendant, Wardell, and J got out of the car. “When we [were] getting

ready to fight,” Dazoveen saw that defendant had a handgun “at his belt buckle.”

Dazoveen did not say anything to defendant, but told Wardell “to come fight [him].”

Dazoveen further testified:

 Q. All right. And what, if anything, did you hear anybody
 else saying to [defendant]?

 A. Well, basically my brother and them was telling him to
 fight. Basically they was telling everybody to fight.

 Q. Okay. Which brother was talking to [defendant]?

 A. Both of them.

 -3-
 STATE V. MERCER

 Opinion of the Court

 Meanwhile, defendant’s mother was attempting to “calm[] down . . . the

situation.” Dazoveen testified that after defendant showed a gun, “we [were] still

trying to fight, and they [were] backing up, and we [were] coming towards them. And

that’s when [defendant] had shot [the gun] in the air.” After defendant fired one shot

in the air, Dazoveen’s “aunt came running through the path, and then [Ms. Mingo]

snatched the gun from her and shot up in the air.” Defendant then “shot back into

the air[]” and Ms. Mingo shot into the air again. Following these shots, Dazoveen

and his relatives returned to the Mingo home, and Dazoveen’s aunt called the police.

Dazoveen and Ms. Mingo both gave recorded statements at the police station and

watched a surveillance video of the altercation which was taken from a nearby home

on the same street.

 At trial, Dazoveen watched the video and testified that three people had guns

during the altercation: defendant, Ms. Mingo, and Dazoveen’s brother, Nacharles. He

also testified that Nacharles fired his gun, but he could not tell at whom Nacharles

was firing. After viewing a video of the statement he gave to police to refresh his

recollection, Dazoveen testified that he told a detective that defendant’s mother had

broken up the fight between him, Wardell, and J on 29 March 2016, and that both of

Dazoveen’s brothers, Jaquarious and Nacharles, fired the same gun during the

altercation on 30 March 2016.

 Ms. Mingo also testified for the State as follows: On 30 March 2016, she

received a phone call from her son, Nacharles, in which he informed her that

 -4-
 STATE V. MERCER

 Opinion of the Court

Dazoveen “had been jumped.” Her other son, Jaquarious, was with her at the time,

and they drove home, during which time she did not make any phone calls. She found

that her mother, her sisters, three of her nephews, three of her nieces, and “[her]

whole family, pretty much, [were] at the house when [she] pulled up.” After seeing

her son Dazoveen’s injuries from his fight with Wardell and J, she “immediately went

to . . . [defendant’s] house through the path, there’s a path, and as a result of me

going, my oldest two went over there to approach [defendant] and the guy J and the

guy Wardell.” Ms. Mingo’s sons were ready to fight and “[she] was not trying to stop

[the fight].” Defendant “was the only one that had the gun out,” which he had removed

from his pants, and he was pointing the gun while saying, “back up, back up.”

 Her sons “continued to advance on him even though he had [a] gun out[.]”

Defendant’s mother was “standing in front of him telling him, Sydney, put the gun

up, put the gun up.” Ms. Mingo testified that by this point, she was screaming, “If

you going to shoot, shoot. If you’re not, put the gun up.” Defendant fired his first shot

“over his mom’s head” toward Ms. Mingo and her family. Ms. Mingo ran after that

first shot and “snatched” her sister’s gun from her hand and fired it in the air. She

testified that defendant shot toward her “[m]aybe three” times and that she shot

toward him “four times, maybe.” Nacharles then took the gun from Ms. Mingo, but

he did not shoot it because it was empty.

 -5-
 STATE V. MERCER

 Opinion of the Court

II. Defendant’s Evidence

 At the conclusion of the State’s evidence, defendant presented evidence which

tended to show the following: Defendant’s mother, Rashieka Mercer (“Ms. Mercer”),

testified at trial that, on 30 March 2016, she “heard a bunch of commotion outside” of

her house, went outside, and witnessed Wardell and Dazoveen “engaged in a fight.”

She “told them to stop it, and at that point [Dazoveen] got up and he left” while

“screaming out that he was going to get his brothers and they were going to kill

[Wardell].” She further testified that no one else was present or involved in the fight

other than Dazoveen and Wardell. Later that same day, Ms. Mercer heard another

commotion outside of her house, and when she went outside, she “saw a crowd of

people basically ambushing [her] son[.]” Ms. Mercer ran outside and tried to explain

that defendant had nothing to do with the earlier fight. At that point, she observed

that Nacharles had a gun, “so [she] got in front of [defendant] trying to shield him[.]”

Defendant also had a gun. Ms. Mingo “was telling her son [Nacharles] to shoot

[defendant].” Nacharles shot his gun, and Ms. Mercer screamed at the crowd about

getting defendant out of there because they were trying to kill him. She also

witnessed Ms. Mingo “chasing [defendant] and shooting at him.”

 Defendant testified in his own defense to the following facts: On 30 March

2016, after arriving home from a job interview, defendant encountered a group of

approximately fifteen people trying to fight. He knew Nacharles, Jaquarious, and

Dazoveen, but did not know the other people. He testified that “[t]he mother of [his]

 -6-
 STATE V. MERCER

 Opinion of the Court

child” was with him in the car. After defendant asked the crowd what was going on,

they told him that jumping their little brother was not right, to which defendant

responded, “I [didn’t] have [anything] to do with it.” However, the group kept

approaching defendant, stating that they were “done talking.” Defendant observed

the handles of three handguns in the possession of Jaquarious, Nacharles, and

another person he did not know. At that point, Wardell had also pulled a gun out

while “talking to them” and “just basically trying to plead our case.” Defendant then

heard the sound of people cocking their guns, so he asked Wardell to give him the

gun, and because “[Wardell] didn’t know what he was doing,” defendant took the gun

from him. Defendant continued trying to plead his case with the group. Defendant

was aware that, as a convicted felon, he was not allowed to possess a firearm, but

testified that “Wardell [] is my little cousin. So at that time, my mother being out

there, . . . I would rather make sure we [are] alive versus my little cousin making

sure, who is struggling with the gun.” He then pointed the gun at the Mingos and

“[kept] telling them to back up” several times. Defendant pointed the gun at

Jaquarious because he “ran up on to the side and right beside [defendant’s] mother,”

and then “shots were being fired” by someone else, but defendant could not tell who

was firing them. Defendant “turned around to see who shot at Shoe,”1 and, after

telling his mother to move out of the way, he “dashed to the side of the street,” and

 1 “Shoe” is not mentioned at any other time throughout the trial transcript.

 -7-
 STATE V. MERCER

 Opinion of the Court

observed that Nacharles was “still shooting at [him], so [defendant] tried to shoot.”

However, the gun jammed and he threw it to Wardell so “he [could] fix it because it’s

his gun, and [defendant] just [ran] home.” Defendant testified that he “only fired one

shot,” toward Nacharles “because he was shooting first.” Defendant turned himself in

to the police early the next morning around midnight.

 During the charge conference, defendant made a timely request in writing that

the trial court instruct the jury on a justification defense to the charge of possession

of a firearm by a felon, which the trial court denied. Defendant objected to the trial

court’s failure to instruct the jury on justification. During jury deliberations, the jury

sent the trial court a note regarding “Justification Defense For Possession of

Firearm,” in which the jury asked the trial court for “Clarification on whether or not

[defendant] can be justified in possession of a firearm even with the stipulation of

convicted felon.” The trial court responded by “reread[ing] and recharg[ing] its

instruction on reasonable doubt and on possession of a firearm by a felon.” Defendant

was found not guilty of both charges of assault with a deadly weapon with intent to

kill and guilty of the charge of possession of a firearm by a convicted felon.

 On appeal, defendant asserts that the trial court erred by refusing his request

for a jury instruction on justification as a defense to the charge of possession of a

firearm by a felon.

 -8-
 STATE V. MERCER

 Opinion of the Court

 Standard of Review

 It is axiomatic that “the trial court must give the instructions requested, at

least in substance, if they are proper and supported by the evidence. The proffered

instruction must . . . contain a correct legal request and be pertinent to the evidence

and the issues of the case.” State v. Edwards, 239 N.C. App. 391, 392, 768 S.E.2d

619, 620 (2015) (citations and quotation marks omitted). “[T]he question of whether

a defendant is entitled to an instruction on the defense of duress or necessity presents

a question of law, and is reviewed de novo.” Id. at 393, 768 S.E.2d at 621.

Accordingly, “where the request for a specific instruction raises a question of law, ‘the

trial court’s decisions regarding jury instructions are reviewed de novo by this Court.’

” Id. (quoting State v. Osorio, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009)).

 We review the evidence in the light most favorable to the defendant. State v.

Monroe, 233 N.C. App. 563, 567, 756 S.E.2d 376, 379 (2014), aff’d per curiam, 367

N.C. 771, 768 S.E.2d 292 (2015) (“[W]e review the evidence in the present case in the

light most favorable to [the] [d]efendant, in order to determine whether there is

substantial evidence of each element of the defense.”).

 Discussion

 On appeal, defendant argues that the trial court erred by denying his request

for an instruction on justification as a defense to the charge of possession of a firearm

by a felon. After careful review of the evidence in the light most favorable to

defendant, we hold that there was substantial evidence of each element of the

 -9-
 STATE V. MERCER

 Opinion of the Court

justification defense in the present case, and defendant was entitled to have the jury

instructed on the defense of justification.

 Under North Carolina law, “[i]t shall be unlawful for any person who has been

convicted of a felony to purchase, own, possess, or have in his custody, care, or control

any firearm or any weapon of mass death and destruction as defined in [N.C. Gen.

Stat. § 14-288.8(c)].” N.C. Gen. Stat. § 14-415.1(a) (2017). “The offense of possession

of a firearm by a convicted felon has two essential elements: (1) the defendant has

been convicted of a felony, and (2) the defendant subsequently possessed a firearm.”

State v. Floyd, 369 N.C. 329, 333, 794 S.E.2d 460, 463 (2016) (citation omitted); see

also State v. Wood, 185 N.C. App. 227, 235, 647, S.E.2d 679, 686 (2007).

 A justification defense to possession of a firearm by a convicted felon was set

forth in United States v. Deleveaux, 205 F.3d 1292, 1297 (11th Cir. 2000). The

Deleveaux test provides that “a defendant must show four elements to establish

justification as a defense” to a charge of possession of a firearm by a felon:

 (1) that the defendant was under unlawful and present,
 imminent, and impending threat of death or serious bodily
 injury; (2) that the defendant did not negligently or
 recklessly place himself in a situation where he would be
 forced to engage in criminal conduct; (3) that the defendant
 had no reasonable legal alternative to violating the law;
 and (4) that there was a direct causal relationship between
 the criminal action and the avoidance of the threatened
 harm.

 - 10 -
 STATE V. MERCER

 Opinion of the Court

State v. Craig, 167 N.C. App. 793, 796, 606 S.E.2d 387, 389 (2005) (quoting Deleveaux,

205 F.3d at 1297); see also United States v. Crittendon, 883 F.2d 326, 330 (4th Cir.

1989).

 This Court has not explicitly adopted the Deleveaux test; however, we have

consistently “assume[d] arguendo, without deciding, that the Deleveaux rationale

applies in North Carolina prosecutions for possession of a firearm by a felon.”

Monroe, 233 N.C. App. at 569, 756 S.E.2d at 380. In State v. Monroe, the defendant

was engaged in an “on-going dispute” with another man, Davis. Id. The defendant

was at the residence of another individual, Gordon, when Davis arrived in Gordon’s

front yard and threatened to “turn the heat up on” the defendant. Id. at 564, 756

S.E.2d at 377. Evidence was also presented that earlier that day, Davis had barged

into a residence in which the defendant was present, and that Davis stated he was

“going to stay out here until the door come open” when he arrived at Gordon’s

residence. Id. However, “[t]he uncontroverted evidence at trial showed that [the]

[d]efendant was inside Gordon’s house when [the] [d]efendant took possession of a

firearm”:

 [The] [d]efendant’s subsequent contentions are that Davis
 “had instigated violence against [the] [d]efendant before,”
 and that remaining inside Gordon’s residence would have
 been “no protection” because Davis had previously “barged
 in” to a residence where [the] [d]efendant was located.
 However, the evidence does not compel a conclusion that,
 while inside the residence, [the] [d]efendant was under
 unlawful and present, imminent, and impending threat of
 death or serious bodily injury.

 - 11 -
 STATE V. MERCER

 Opinion of the Court

 ...

 We thus cannot rely on the mere possibilities that (1) Davis
 may have been about to enter the residence and (2) that
 Davis then would have threatened death or serious bodily
 injury to [the] [d]efendant. [The] [d]efendant has failed to
 show that he was under “unlawful and present, imminent,
 and impending threat of death or serious bodily injury” at
 the time he took possession of the firearm.

Id. at 570, 756 S.E.2d at 381 (quoting Craig, 167 N.C. App. at 796, 606 S.E.2d at 389)

(internal quotation marks omitted).

 We further concluded that the “[d]efendant also failed to show that he ‘had no

reasonable legal alternative to violating the law.’ ” Id. at 571, 756 S.E.2d at 381.

“The [d]efendant voluntarily armed himself and then walked to the doorway of the

residence. [The] [d]efendant has not shown there was no acceptable legal alternative

other than arming himself with a firearm, in violation of N.C. [Gen. Stat.] § 14-415.1,

and walking to the doorway of Gordon’s house.” Id. Accordingly, this Court held that

the evidence, “even when viewed in the light most favorable to [the] [d]efendant, does

not support a conclusion that [the] [d]efendant, upon possessing the firearm, was

under unlawful and present, imminent, and impending threat of death or serious

bodily injury.” Id. at 569, 756 S.E.2d at 380.

 This Court has applied the Deleveaux test in several other cases as well,

although the defendant has never satisfied each of the elements in any of these cases.

See, e.g., Edwards, 239 N.C. App. at 395, 768 S.E.2d at 622 (no evidence of facts in

 - 12 -
 STATE V. MERCER

 Opinion of the Court

support of any elements of the Deleveaux test); State v. McNeil, 196 N.C. App. 394,

674 S.E.2d 813 (2009) (possession of firearm while under no present or imminent

threat of death or injury); Craig, 167 N.C. App. at 797, 606 S.E.2d at 389 (possession

of firearm after threat subsided); State v. Boston, 165 N.C. App. 214, 598 S.E.2d 163

(2004) (possession of firearm while under no present or imminent threat of death or

injury); State v. Napier, 149 N.C. App. 462, 560 S.E.2d 867 (2002) (possession of

firearm while under no present or imminent threat of death or injury).

 The present case is distinguishable from the prior cases in which this Court

has applied the Deleveaux test. Here, defendant presented evidence that he grabbed

the gun only after he heard guns cocking and witnessed his cousin struggling with

the gun. In defendant’s brief, he addresses each element of the Deleveaux test as

follows:

 a. [Defendant’s] testimony that he only grabbed the gun
 from Wardell when he heard guns being cocked, and threw
 it back to Wardell when he was able to run away supported
 the first element of the defense: That he only possessed the
 gun during the time he was under an unlawful and present
 imminent and impending threat of death or serious bodily
 injury;

 b. The evidence was uncontroverted that the Mingos came
 to [defendant’s] premises as aggressors, intending to fight,
 and [defendant’s] testimony that when he got out of his car
 they were already there seeking a fight supported the
 second element of the defense: That he did not negligently
 or recklessly place himself in this situation where he would
 be forced to engage in criminal conduct;

 c. [Defendant’s] testimony that he continually used words,

 - 13 -
 STATE V. MERCER

 Opinion of the Court

 trying to “plead his case,” in responding to the aggressors
 and that he only resorted to grabbing the gun from Wardell
 when he heard guns being cocked supported the third
 element of the defense: That he had no reasonable
 alternative to violate the law; and

 d. [Defendant’s] testimony that he only took possession of
 the gun when he heard guns being cocked and relinquished
 possession when he was able to run away supported the
 fourth element of the defense: That there was a direct
 causal relationship between the criminal action and the
 avoidance of the threatened harm.

We find the facts presented and the application of the evidence to the elements of the

Deleveaux test convincing.

 The State contends that, “even assuming the Court were to apply the

Deleveaux test, . . . the evidence does not support the third element that . . . defendant

had no reasonable legal alternative to violating the law.” In advancing this

argument, the State asserts that defendant could have left the dangerous scene at

his home or called 911, both of which are legal alternatives “to violating the law by

taking the gun from his cousin.” We disagree. As defendant asserts in his reply brief,

“[o]nce guns were cocked, time for the State’s two alternative courses of action—

calling 911 or running away through the park—had passed.”

 The determination of whether defendant acted reasonably, in light of the

possible legal alternatives, is a question for the jury, after appropriate instruction.

See, e.g., State v. Barrett, 20 N.C. App. 419, 423, 201 S.E.2d 553, 555-56 (1974) (“The

reasonableness of defendant’s action and of his belief that force was necessary

 - 14 -
 STATE V. MERCER

 Opinion of the Court

presents a jury question.”) (citation omitted). Accordingly, defendant was entitled to

have the jury instructed on justification as a defense to the charge of possession of a

firearm by a felon.

 Furthermore, we conclude that defendant was prejudiced by this error.

Pursuant to N.C. Gen. Stat. § 15A-1443(a), “a defendant is prejudiced by errors

relating to rights arising other than under the Constitution of the United States when

there is a reasonable possibility that, had the error in question not been committed,

a different result would have been reached at the trial . . . .” N.C. Gen. Stat. § 15A-

1443(a) (2017); see also State v. Rose, 323 N.C. 455, 458, 373 S.E.2d 426, 428 (1988)

(finding that the trial court’s failure to give defendant’s requested instruction was

prejudicial under N.C. Gen. Stat. § 15A-1443(a)).

 In the present case, it is undisputed that defendant fired one or more shots

during the altercation. However, the jury was instructed on self-defense with regard

to the assault charges. The jury then acquitted defendant of both charges of assault

with a deadly weapon with intent to kill as well as the lesser-included offense of

assault with a deadly weapon. In contrast, the jury was not instructed on justification

with regard to the charge of possession of a firearm by a felon, and the jury then

convicted defendant of that charge. Moreover, during jury deliberations, the jury sent

the trial court a note titled “Justification Defense For Possession of Firearm,” in

which the jury asked the trial court for “Clarification on whether or not [defendant]

can be justified in possession of a firearm even with the stipulation of convicted felon.”

 - 15 -
 STATE V. MERCER

 Opinion of the Court

We conclude that there is a reasonable probability that, had the trial court provided

defendant’s requested justification instruction to the jury, the jury would have

reached a different result. See N.C. Gen. Stat. § 15A-1443(a).

 Conclusion

 For the reasons stated herein, we conclude that the trial court committed

prejudicial error by denying defendant’s request for a jury instruction on justification

as a defense to the charge of possession of a firearm by a felon. Accordingly, we hold

that defendant is entitled to a new trial.

 NEW TRIAL.

 Judges ELMORE and HUNTER, JR. concur.

 - 16 -